**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

FRANK JAMES, M.D.; and
CHELSEA ARATA, N.P.,

      Plaintiffs,

v.

MIND SPRINGS, INC., a Colorado non-profit corporation;
COLORADO WEST, INC., a Colorado non-profit corporation;
MIND SPRINGS HEALTH, INC., a Colorado non-profit corporation;
COLORADO WEST PSYCHIATRIC HOSPITAL, INC., a Colorado non-profit corporation;
WEST SPRINGS HOSPITAL, INC., a Colorado non-profit corporation; and
JOHN M. SHEEHAN, an individual,

      Defendants.

---

**PLAINTIFFS' ORIGINAL COMPLAINT
AND JURY DEMAND**

---

Plaintiffs Frank James, M.D., and Chelsea Arata bring this action under state and federal laws against the corporate entities Mind Springs, Incorporated; Colorado West, Incorporated; Mind Springs Health, Incorporated; Colorado West Psychiatric Hospital, Incorporated; and West Springs Hospital, Incorporated (collectively "Mind Springs"); and John Sheehan an individual (collectively, the "Defendants") to recover all damages and other remedies established by such laws. In support thereof, Plaintiffs allege the following:

## INTRODUCTION

1. Plaintiffs Frank James, M.D., and Chelsea Arata are former Mind Springs employees who internally reported Mind Springs's violations of state and federal patient safety and Medicaid regulations, including to Mind Springs's then-Chief Executive Officer, Defendant John M. Sheehan.

2. Plaintiffs reasonably believed that Mind Springs violated state and federal laws and regulations by, *inter alia*,, creating clearly unsafe environments for its patients; endangering young patients' safety and health; mandating Mind Springs employees to improperly admit into its adolescent inpatient and outpatient programs minor children who were as young as seven years old; fraudulently representing to Medicaid that it was providing services that it was not actually providing; and fraudulently billing Medicaid for services that it was not actually providing.

3. At the insistence of Defendant Sheehan, Mind Springs terminated Plaintiffs because they made such reports.

4. Mind Springs terminated Plaintiffs because they engaged in protected activity by making these reports, in violation of the anti-retaliation provisions of the federal False

Claims Act, Colorado's False Claims Act, the Colorado Medicaid False Claims Act, and Colorado state law.

5. After receiving notice of Plaintiffs' concerns about Mind Springs's illegal conduct, Defendant Sheehan tortiously interfered with Dr. James's and Ms. Arata's employment contracts.

6. In this civil action, Plaintiffs bring claims against Defendants under federal and state law, based on Mind Springs's illegal conduct and retaliatory termination of Plaintiffs.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367.

8. Venue is proper in this judicial district pursuant to 31 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

9. The Court may exercise personal jurisdiction over Defendants because Plaintiffs' claims arise out of Defendants' contacts with Colorado, and Defendants conduct business in Colorado.

## PARTIES AND IMPORTANT NON-PARTIES

***Plaintiff Chelsea Arata & Ms. Arata's Professional Background***

10. Plaintiff Chelsea Arata currently resides in Indiana, but at all relevant times resided in the state of Colorado.

11. Ms. Arata began her employment with Mind Springs on September 12, 2016, as a registered nurse.

3

12. In October 2016, Ms. Arata completed the licensure requirements under Colorado law to become a nurse practitioner and, as a result, became a Licensed Nurse Practitioner (LPN), and continued working for Mind Springs as an LPN.

13. After a period of maternity leave beginning March 2021, Ms. Arata returned to Mind Springs in December 2021 as an LPN and outpatient care provider.

***Plaintiff Dr. James and Dr. James's Professional Background***

14. Dr. James currently resides in Pennsylvania, but at all relevant times resided in the state of Colorado.

15. At all relevant times, Dr. James was licensed to practice medicine in the state of Colorado.

16. Dr. James began working at Mind Springs as Outpatient Medical Director in December 2020.

17. On August 5, 2022, Dr. James and Mind Springs entered into an agreement for Dr. James to become Mind Springs's Chief Medical Officer.

18. Dr. James became Mind Springs's Chief Medical Officer in August 2022.

***Defendants***

19. Defendant John M. Sheehan was, at all relevant times, the Chief Executive Officer ("CEO") of Mind Springs and its subsidiaries, and resided in the state of Colorado.

20. Upon information and belief, Mr. Sheehan "stepped down" as CEO of Mind Springs on or about November 18, 2024.[1]

---

[1] *See* MIND SPRINGS HEALTH ANNOUNCES NEW MANAGEMENT AGREEMENT AND INTERIM CEO WITH LARKIN HEALTH, https://www.mindspringshealth.org/news/mind-springs-health-announces-new-management-agreement-and-interim-ceo-with-larkin-health/ (last accessed Dec. 10, 2024).

21. Mind Springs, Inc., also known as Colorado West, Inc., is a Colorado Nonprofit Corporation located in Grand Junction, Colorado that provides mental wellness, behavioral change, and substance abuse treatment and services.

22. Colorado West, Inc., doing business as Mind Springs, Inc. and known as West Springs Hospital Inc., is a Corporate Nonprofit Corporation located in Grand Junction, Colorado that provides mental wellness, behavioral change, and substance abuse treatment and services.

23. Colorado West Psychiatric Hospital, Inc., doing business as West Springs Hospital, Inc., is a Colorado Nonprofit Corporation located in Grand Junction, Colorado. Colorado West Psychiatric Hospital that provides treatment and other support services to persons suffering from mental illness, alcohol, and substance abuse.

24. West Springs Hospital, Inc., also known as Colorado West, Inc., is a Colorado Nonprofit Corporation located in Grand Junction, Colorado. West Springs Hospital, Inc., provides treatment and other support services to persons suffering from mental illness, alcohol, and substance abuse.

***Important Non-Parties***

25. At all relevant times, Elizabeth Tice was Mind Springs's Chief Operating Officer.

26. At all relevant times, Norma Roberts was Mind Springs's Vice President of Human Resources.

27. At all relevant times, Stefan Bates was President of Mind Springs's Board of Directors.

28. Dr. David Conklin became Mind Springs's Chief Medical Officer after Dr. James was terminated, and was Ms. Arata's supervisor and had authority to investigate and prevent improper conduct at Mind Springs.

## **GENERAL ALLEGATIONS**

### *Ms. Arata's Employment and Work Performance*

29. Ms. Arata's work performance at Mind Springs was widely praised.

30. Ms. Arata's then-supervisor, Dr. Frank Lotrich, Mind Springs's Inpatient Medical Director, routinely praised Ms. Arata's work performance.

31. Throughout Ms. Arata's annual performance reviews, Dr. Lotrich described Ms. Arata as respected and high performing.

### *Dr. James's Employment and Work Performance*

32. Dr. James has extensive experience in inpatient and outpatient medical care in the behavioral health field.

33. From December 2020 through July 2022, Dr. James was Mind Springs's Outpatient Medical Director

34. As Outpatient Medical Director, Dr. James implemented numerous successful program changes at Mind Springs, including rebuilding an outpatient provider group; revamping Mind Springs's electronic medical record programming; and hiring over ten new healthcare providers at Mind Springs.

35. Following Dr. James's successful performance as Outpatient Medical Director, Mr. Sheehan offered Dr. James the position of Mind Springs's Chief Medical Officer in August 2022.

36. Dr. James relied on Mr. Sheehan's offer of employment and the terms of his employment agreement to become Mind Springs's Chief Medical Officer by withdrawing his prior acceptance of the position of Behavioral Health Medical Lead for

Humana Incorporated's new "Louisiana Medicaid" product, a position that was scheduled to begin in late-August 2022 in New Orleans, Louisiana.

37. Mr. Sheehan extended the offer for Dr. James to become Mind Springs's Chief Medical Officer based on Dr. James's widely recognized, excellent work performance at Mind Springs.

38. Dr. James accepted, and he and Mind Springs entered into an employment agreement for his employment as Chief Medical Officer.

39. The term of the employment agreement between Mind Springs and Dr. James was three (3) years.

40. In the employment agreement between Mind Springs and Dr. James, Dr. James's salary was $375,000.00 per year, and included provisions that awarded Dr. James with bonuses at subsequent stages of his employment at Mind Springs.

41. Dr. James's employment agreement also contained restrictions on and required notices for the termination of his employment by Mind Springs.

42. Dr. James's employment agreement required that any termination either be the result of "Gross Misconduct" or a 90 day notice of termination.

***Dr. James Discovers Mind Springs's Illegal Conduct, Takes Efforts to Stop Violations of Medicaid Requirements, Makes Reports Regarding Medicaid Violations and Risks to Patient Safety, and is Terminated***

43. While employed as Mind Springs's Chief Medical Officer, Dr. James discovered Mind Springs was violating state and federal patient safety and Medicaid regulations.

44. While employed as Mind Springs's Chief Medical Officer, Dr. James discovered that Mind Springs's practices posed tremendous risks to patient safety.

45. Dr. James's discovery of Mind Springs's illegal conduct and the risk to its patients' safety began shortly after he started working as Chief Medical Officer in early August of 2022.

46. By August 8, 2022, Dr. James discovered Mind Springs was not providing a sufficient number of healthcare providers at West Springs Hospital (WSH) to meet minimum staffing requirements under Colorado law.

47. By our about mid-August 2022, Dr. James discovered records in patient charts showing WSH was documenting services to patients that it was not actually providing.

48. By or about mid-August 2022, Dr. James discovered that patient documentation demonstrated Mind Springs was also billing Medicaid for patient services it did not actually render or provide to patients, and that Mind Springs's inpatient records lacked sufficient documentation to properly bill Medicaid for its services.

49. Dr. James reasonably believed that Mind Springs was providing Medicaid with inaccurate patient documentation in order to receive funding from the Center for Medicare & Medicaid Services ("CMS") and Colorado's Medicaid organization, Rocky Mountain Health Plan.

50. On September 9, 2022, Dr. James met with Mr. Sheehan and his (Dr. James's) executive coach, Ken Giglio, for whose services Mind Springs reimbursed Dr. James.

51. In the September 9, 2022, meeting, Dr. James reported his concerns regarding Mind Springs's staffing levels, patient safety, and Medicaid compliance to Mr. Sheehan.

52. In the September 9, 2022, meeting with Mr. Sheehan and Mr. Giglio, Dr. James specifically reported his reasonable beliefs that, *inter alia*, (1) Mind Springs did not have sufficient staffing levels at WSH to comply with Colorado law and ensure patient

safety; (2) that Mind Springs's patient documentation stated Mind Springs was providing patient services that it was not actually providing, in violation of federal and state law; (3) that Mind Spring's inpatient records lacked sufficient documentation to properly bill Medicaid for its services, in violation of federal and state law; (4) that Mind Springs's patient documentation demonstrated Mind Springs was billing Medicaid for patient services it was not actually providing, in violation of federal and state law, and showed Mind Springs's efforts to improperly receive Medicaid funding; and (5) that Mind Springs's practices created grave and clear risks to patient safety.

53. Throughout the week prior to September 9, 2022, Dr. James spoke several times with Laura Byard, Mind Springs's Chief Clinical Officer, about the same concerns Dr. James raised to Mr. Sheehan in the September 9, 2022, meeting.

54. In his meetings with Ms. Byard, Dr. James reported the same concerns he communicated to Mr. Sheehan on September 9, 2022.

55. Ms. Byard told Dr. James that she shared his belief that, based on Mind Springs's conduct, Mind Springs was violating numerous state and federal patient safety and Medicaid regulations, and that Mind Springs's practices posed grave risks to patient safety.

56. On September 14, 2022, Mr. Sheehan told Dr. James he needed to meet with Dr. James and Ms. Tice.

57. Mr. Sheehan insisted that the three of them meet at a brewery in Grand Junction, Colorado, on September 14, 2022, off Mind Springs's medical campuses.

58. It was highly unusual to hold such a meeting off-site from Mind Springs's medical campuses.

59. At this off-campus meeting on September 14, 2022, Dr. James reported his concerns, based on his reasonable beliefs, about Mind Springs's improper Medicaid billing practices and the risks to patient safety at Mind Springs caused by Mind Springs's violations of Colorado medical regulations. Dr. James's reports included the following:

60. ***First***, consistent with his earlier comments on September 9, 2022, to Mr. Sheehan, and his conversations with Ms. Byard, Dr. James reasonably believed and reported to Mr. Sheehan and Ms. Tice on September 14, 2022, that Mind Springs's inadequate staffing head count and practitioner ratios violated Colorado law.

61. Dr. James told Mr. Sheehan that Mind Springs's failure to meet adequate staffing head count for its inpatient and outpatient services violated Colorado regulations that required Mind Springs to provide a sufficient number of medical staff members to properly and safely operate its inpatient and outpatient facilities.

62. On September 14, 2022, when Dr. James reported his staffing headcount and patient safety concerns to Mr. Sheehan and Ms. Tice, Mr. Sheehan responded that he could manipulate Mind Springs's patient-to-staff ratios at any time after the fact in order to show compliance with Colorado Department of Public Health and Environment ("CDPHE") regulations regarding patient safety and Mind Springs's staff head count.

63. Mr. Sheehan told Dr. James he wanted Mind Springs to continue admitting patients, even if admitting those patients would result in violation of CDPHE's minimum staffing, provider ratio, and patient safety requirements.

64. ***Second,*** Dr. James reported his concern, based on his reasonable beliefs, that Mind Springs's inadequate staffing head count meant it was not competently and safely providing inpatient and outpatient services to Mind Springs's patients.

65. **Third**, in response to Mr. Sheehan's previously expressed goal to open a psychiatric emergency room by October 1, 2022, and directives to Mind Springs's employees, including Dr. James, to participate in achieving this goal, Dr. James reported that Mind Springs could not achieve this goal in such a short timeframe because it lacked (1) sufficient staffing and (2) the medication dispensing protocol required by Colorado law for such an emergency room.

66. Dr. James told Mr. Sheehan that attempting to open an emergency room so quickly would result in improperly trained medical staff, inadequate patient safety, and the distinct possibility that untrained emergency room staff would incorrectly and improperly bill Medicaid for services provided in the emergency room.

67. Dr. James stated he could not participate in Mr. Sheehan's short timeline plan, because doing so would compromise patient safety and legal compliance.

68. **Fourth**, Dr. James reasonably believed and reported Mind Springs could not safely admit patients younger than twelve years of age, despite Mr. Sheehan's insistence that Dr. James and other Mind Springs staff admit any child under the age of twelve.

69. Dr. James reported to Mr. Sheehan that Colorado law prohibited commingling adolescent patients and children in the same inpatient care units, and that Mind Springs doing so put patients in unsafe conditions.

70. Dr. James further reasonably believed and reported, consistent with his other reports, that Mind Springs's continued admissions of young patients itself created safety risks, because this would result in more children being admitted without enough staff able to ensure adequate patient safety.

71. Dr. James told Mr. Sheehan that he refused to improperly admit children under the age twelve.

72. Mr. Sheehan and Ms. Tice responded to Dr. James's concerns by stating Mind Springs would admit every child, including those under twelve, and adolescent, regardless of its non-compliant staffing ratios and the clear patient safety risks that admitting children under the age of twelve created.

73. ***Fifth***, Dr. James reasonably believed and reported Mind Springs was billing Medicaid for outpatient services with incorrect diagnostic specifiers, by adding, changing, and/or omitting diagnoses for patients.

74. Dr. James reasonably believed and reported that Mind Springs's improper billing practices amounted to Medicaid violations.

75. Dr. James reasonably believed that Mind Springs was providing Medicaid with inaccurate patient documentation in order to improperly receive funding from CMS and Rocky Mountain Health Plan.

76. Based on his discoveries of Mind Springs's Medicaid violations, Dr. James told Mr. Sheehan on September 14, 2022, that he wanted to conduct an investigation of Mind Springs's billing practices in order to bring it into compliance with Medicaid laws and regulations.

77. Dr. James's reports and refusals were ill-received.

78. In response to Dr. James's Medicaid billing concerns and request to investigate them, Mr. Sheehan told Dr. James that he was prohibited from investigating Mind Springs's billing practices.

79. After Dr. James made his reports, discussed above, to Mr. Sheehan and Ms. Tice on September 14, 2022, at the brewery, a now intoxicated Mr. Sheehan shouted that he was "going to fire" Dr. James, and that Dr. James could not "ever question us again."

80. Dr. James reported Mr. Sheehan's behavior to Ms. Roberts of Mind Springs's Human Resources Department that evening of September 14, 2022.

81. Dr. James immediately called Ms. Roberts upon leaving the brewery, to notify her of Mr. Sheehan's inappropriate and harassing conduct.

82. Dr. James also reported to Ms. Roberts his reasonable beliefs that Mind Springs was violating federal and state law.

83. Dr. James stated specifically to Ms. Roberts that Mr. Sheehan's conduct—i.e., his belligerence and threats to fire Dr. James—was in direct response to Dr. James's reports of Mind Springs's inadequate patient safety and improper Medicaid billing, as well as Dr. James's refusal to violate medical regulations by improperly admitting children younger than twelve and prematurely opening a psychiatric emergency room.

84. Dr. James also reported to Ms. Roberts the same concerns he raised to Mr. Sheehan and Ms. Tice earlier that afternoon at their brewery meeting, including his concerns relating to Mind Springs's inadequate and unsafe staffing, Mr. Sheehan's unsafe goal for a rapid opening of an emergency room, the practice of improperly and unsafely admitting patients under the age of twelve, and Mind Springs's improper Medicaid billing.

85. Ms. Roberts responded to Dr. James's concerns by instructing him to "bury it" and "not push the issue."

86. Dr. James drafted a letter that evening on September 14, 2022, regarding his reports to Mr. Sheehan, Ms. Tice, and Ms. Roberts that he intended to later send to Mind Springs' Human Resources Department.

87. In this letter, as in his phone call with Ms. Roberts, Dr. James reported both his substantive patient safety and Medicaid billing concerns and complaints regarding Mr. Sheehan's outrageous behavior.

88. Upon information and belief, on or about the evening of September 14, 2022, Ms. Roberts contacted Mr. Sheehan herself, giving Mr. Sheehan advanced notice of all of Dr. James's concerns, and informing Mr. Sheehan about Dr. James's report to her.

89. On September 15, 2022, Dr. James contacted the President of Mind Springs's Board of Directors, Stefan Bates, requesting a meeting with Mr. Bates to discuss Dr. James's numerous reports that he raised to Mr. Sheehan, Ms. Tice, and Ms. Roberts on September 14, 2022.

90. On September 16, 2022, Dr. James filed the Human Resources complaint letter against Mr. Sheehan he drafted on the night of September 14, 2022, following his meeting at the brewery with Mr. Sheehan and Ms. Tice.

91. Dr. James did so by submitting an e-mail to Ms. Roberts setting forth, *inter alia*, his patient safety, staffing headcount, and Medicaid compliance concerns, and specifically detailing Mr. Sheehan's inappropriate behavior on September 14, 2022.

92. On September 16, 2022, Dr. James also met with Mr. Sheehan and Ms. Tice.

93. In this meeting on September 16, 2022, Dr. James reiterated that Mind Springs's conduct violated numerous CDPHE and Medicaid regulations and guidelines.

94. He also explained in the September 16, 2022, meeting that, *inter alia*, Mr. Sheehan's hurried efforts to open a psychiatric emergency room within sixteen days would violate additional CDPHE regulations and guidelines, because, among other things, Mind Springs did not have sufficient staff head count to safely and compliantly open an emergency room.

95. In the September 16, 2022, meeting and in response to Dr. James's reports, Mr. Sheehan said that by failing to follow Mr. Sheehan's directives, Dr. James was "insubordinate," "failing to do his job," and "playing games."

96. Mr. Sheehan continued, stating if Dr. James continued to raise his concerns and make his reports that "it's gonna get you fired."

97. Ms. Tice, rather than take Dr. James's reiterated concerns and reports seriously, admonished him for undermining Mr. Sheehan's plans and Mind Springs's practices as unsafe, and told Dr. James he was required to put up a "united front" with Mr. Sheehan.

98. At the end of the September 16, 2022, meeting, Mr. Sheehan placed Dr. James on "probation."

99. Mr. Sheehan did not explain what being on "probation" entailed.

100. Mr. Sheehan stated Dr. James had "lost [his] trust."

101. After the September 16, 2022, meeting, Dr. James's access to his Mind Springs email account, as well as his access to Mind Springs documents, was blocked.

102. Following their meeting and later in the day on September 16, 2022, Mr. Sheehan forbade Dr. James from returning to Mind Springs's campus, and told Dr. James he was required to turn in his keys to Mind Springs's Human Resources Department.

103.    Mr. Sheehan then informed Dr. James that he was suspended without pay.

104.    On September 17, 2022, Dr. James sent to Ms. Roberts and Mr. Sheehan a letter via email stating he was uncomfortable with Mind Springs using his name and licensure on outward-facing communications, including any and all communications to the CDPHE, since he had been suspended as Chief Medical Officer and Mind Springs was continuing to violate Colorado medical regulations and commit Medicaid billing violations.

105.    Later that day, September 17, 2022, Dr. James also contacted Dr. Kevin Fitzgerald, the Medical Officer for Mesa County Public Health, stating that he needed Dr. Fitzgerald's help in contacting the Chief Executive Officer of Rocky Mountain Health Plan, Patrick Gordon, about his concerns and reports regarding Mind Springs's improper billing practices and inadequate patient safety.

106.    On or about September 19, 2022, Dr. James contacted Susan Howard, a Deficiency List Reviewer at the CDPHE.

107.    In his September 19, 2022, phone call with Ms. Howard, Dr. James reported, *inter alia*, his concerns for patient safety at Mind Springs, as well as that Mind Springs's conduct violated many of Colorado medical regulations, including Medicaid laws and regulations.

108.    Ms. Howard thanked Dr. James for his phone call.

109.    Upon information and belief, on the morning of September 20, 2022, Mr. Sheehan received notice of Dr. James's report to the CDPHE.

110.    Later in the day, on September 20, 2022, Mr. Sheehan terminated Dr. James's employment.

111.    Dr. James received notice of his termination through a "Termination of Employment" notice, sent to Dr. James on September 20, 2022.

112.    Mind Springs did not give Dr. James a 90 day notice of termination nor had Dr. James engaged in "Gross Misconduct."

113.    Consequently, Mind Springs's termination of Dr. James violated the provisions of Dr. James's employment agreement.

### *Ms. Arata Discovers Mind Springs's Illegal Conduct, Takes Efforts to Stop Violations of State Law, Makes Reports Regarding Violations of State Law and Risks to Patient Safety, and is Terminated*

114.    After Mr. Sheehan began his tenure as Mind Springs's CEO in August 2022, Ms. Arata discovered that, pursuant to Mr. Sheehan's directions to her and the admissions staff, she was now being forced to admit patients under the age of twelve into Mind Springs's inpatient and outpatient programs, regardless of patient safety issues and inadequate staffing.

115.    Members of Mind Springs's patient admissions team told Ms. Arata that, per Mr. Sheehan's directives, she was required to admit patients under the age of twelve into Mind Springs's inpatient and outpatient programs.

116.    Mr. Sheehan directed the patient admissions team to inform Mind Springs personnel, including Ms. Arata, that Mind Springs personnel were required to admit children of any age as patients, including children under the age of twelve.

117.    Ms. Arata's understanding was that Mr. Sheehan's goal was to admit as many patients as possible, notwithstanding their age or diagnoses.

118.    On September 18, 2022, Ms. Arata was working in MSH's outpatient facility.

119.   During Ms. Arata's shift, a patient under twelve arrived who required a level of treatment and care that Ms. Arata believed MSH could not meet, because it did not have the staffing headcount or patient care protocols for patients under the age of twelve.

120.   Ms. Arata directly communicated with members of the patient admission team working on the night of September 18, 2022, that it was inappropriate to admit a patient under the age of twelve.

121.   Ms. Arata made clear in her report that she did not want—nor did she think it was appropriate—to admit the child.

122.   Ms. Arata refused to admit the child.

123.   Notwithstanding Ms. Arata's report and reasonable belief that the child's admission into Mind Springs would be illegal and create a clear safety risk for the child, she was forced to admit the child pursuant to Mr. Sheehan's mandate to admit as many children as possible, even children under the age of twelve.

124.   Upon information and belief, on the night of September 18, 2022, when Ms. Arata refused to admit the young child, a member of Mind Springs's patient admissions team told Ms. Arata that Mr. Sheehan had mandated Mind Springs "had to take these kids," and that Mr. Sheehan did not "want to hear anything about" denying patients based on their age.

125.   On the morning of September 19, 2022, Ms. Arata told Jessica Schmalz, the Head of Nursing for WSH, that admitting an eight-year-old child on the evening of September 18, 2022, was improper and violated Colorado law.

126.    As a result of this September 18, 2022, incident, and the reports Ms. Arata made on September 18 and 19, 2022, about her reasonable belief that admitting an eight-year-old child violated Colorado law, on midday September 19, 2022, Ms. Arata was summoned to an administrative meeting conducted over Zoom.

127.    Mr. Sheehan attended this administrative meeting, along with other Mind Springs executives.

128.    Ms. Arata was reminded by Mr. Sheehan and the other executives in attendance that she was required to admit children as young as eight-years-old, including the patient about whom she reported her concerns on September 18, 2022.

129.    Ms. Arata asked why Mind Springs required the child's admission, in light of her ongoing concerns for patient safety and compliance with Colorado law.

130.    In the September 19, 2022, administrative meeting, Ms. Arata reiterated her concerns for patient safety for patients under twelve to Mr. Sheehan.

131.    Ms. Arata stated that admitting children under the age of twelve into Mind Springs's inpatient and outpatient facilities was improper because, *inter alia*, Mind Springs did not have a dedicated, specific clinical space for children under the age of twelve, and Mind Springs staff had not been trained for admitting children under twelve or providing patients under the age of twelve with adequate safety after being admitted.

132.    Even after Ms. Arata explained the situation, including Ms. Arata's initial refusal to admit the child based, *inter alia*, on her patient safety concerns, Mr. Sheehan expressed his displeasure with Ms. Arata's efforts to refuse the admission of the child.

133.    Mr. Sheehan stated Ms. Arata should "just admit patients, period."

134.    Ms. Arata was then dismissed from the September 19, 2022, administrative meeting.

135.    Upon information and belief, following Ms. Arata's dismissal from the meeting, Mr. Sheehan commented to other attendees that Ms. Arata was a "bad provider" and "responsible" for insurance coverage denials.

136.    Following Dr. James's termination, on September 20, 2022, Ms. Arata reported her concerns regarding Mind Springs to Dr. David Conklin, who assumed Dr. James's position as Chief Medical Officer following Dr. James's termination.

137.    Specifically, Ms. Arata reasonably believed and reported to Dr. Conklin that: (1) Mind Springs did not have sufficient staffing levels and head count, in violation of Colorado law; (2) Mind Springs's patient documentation stated Mind Springs was providing patient services that it was not actually providing; and (3) Mind Springs's practices were creating grave risks to patient safety, because, amongst other things, Mind Springs staff lacked specific de-escalation training for children under the age of twelve, and Mind Springs had not created a milieu or clinical environment for patients it admitted under the age of twelve separate from its adolescent facilities.

138.    Dr. Conklin said he would address Ms. Arata's concerns.

139.    Dr. Conklin never did.

140.    Instead, Dr. Conklin terminated Ms. Arata on September 23, 2022.

141.    Upon information and belief, Dr. Conklin terminated Ms. Arata at Mr. Sheehan's direction and because of her prior reports and refusals to admit young patients under the age of twelve.

***CDPHE's Findings Regarding Mind Springs's Conduct***

142.    Dr. James's and Ms. Arata's reports and conduct were informed by previous CDPHE investigations that had revealed ongoing and systemic problems at Mind Springs in the middle of 2022.

143.    Subsequent to Plaintiffs' terminations, on October 20, 2022, the CDPHE sent Dr. James two letters regarding its findings about Dr. James's September 19th complaint.

144.    ***In the first letter***, the CPDHE concluded Dr. James's report that Mind Springs "failed to ensure staff were trained to keep patients safe during a crisis situation was substantiated," and that Mind Springs "staff were not trained to monitor patients who could be involved in a crisis situation" was substantiated.

145.    The CDPHE also concluded Mind Springs failed to "comply with applicable federal regulations" governing hospitals.

146.    The CPDHE also concluded that Dr. James's report that Mind Springs "failed to administer medications in accordance with acceptable standards was substantiated."

147.    The CPDHE also concluded that patients' "medications were administered without a provider order or medications were not as intended due to medication orders expiring."

148.    ***In the second letter***, the CPDHE reiterated its conclusion Dr. James's report that Mind Springs "failed to ensure staff were trained to keep patients safe during a crisis situation" was "substantiated."

149.    The CDPHE also concluded that Mind Spring "failed to comply with applicable state regulations" governing hospitals.

150.  The CPDHE also concluded that Dr. James's report that Mind Springs "failed to administer medications in accordance with acceptable standards was substantiated."

151.  The CDPHE also concluded, consistent with its first letter, that patients' "medications were administered without a provider order or medications were not administered as intended due to medication orders expiring."

***Following Dr. James's and Ms. Arata's Retaliatory Terminations, Mind Springs Files Unjustified Complaints Against Them to Colorado Regulatory Agencies Because They Engaged in Protected Activity***

152.  Following their terminations, Defendants targeted Dr. James and Ms. Arata in local news outlets and in complaints to the Colorado Medical Board, Department of Regulatory Agencies, and Colorado Board of Nursing.

153.  Mr. Sheehan targeted Dr. James and Ms. Arata because they engaged in the protected activity of reporting Mind Springs's violations of state and federal laws and regulations, as discussed above.

154.  Following Dr. James's termination, Mind Springs filed a complaint against him with the Colorado Medical Board and Department of Regulatory Agencies, alleging he violated the Medical Practice Act due to his allegedly gross misconduct and unprofessionalism.

155.  On December 9, 2022, the Colorado Medical Board informed Dr. James that "there were insufficient grounds to warrant the commencement of formal disciplinary proceedings [against him] as required by" Colorado law.

156.  Following Ms. Arata's termination on September 23, 2022, Dr. Conklin filed a report against Ms. Arata's nursing license with the Colorado Board of Nursing on September 28, 2022.

157. Ms. Roberts files a separate complaint against Ms. Arata to the Colorado Board of Nursing on September 29, 2022.

158. Both alleged Ms. Arata violated the Nurse Practice Act.

159. The Colorado Board of Nursing ultimately exonerated Ms. Arata, finding Dr. Conklin's and Ms. Roberts' complaints "meritless."

160. The Board of Nursing dismissed the complaints against Ms. Arata.

161. Mr. Sheehan explained Mind Springs's decision to terminate and file complaints against Dr. James and Ms. Arata with the Colorado Medical Board and Colorado Board of Nursing, respectively, in statements he made to reporters for the *Grand Junction Sentinel.*

162. Specifically, referring to Dr. James and Ms. Arata Mr. Sheehan stated that "because they have made what [Mind Springs] says are false claims, [Mind Springs] has filed formal complaints against the two."

163. Mr. Sheehan stated to reporters that he had made the decision to terminate Dr. James and Ms. Arata because they had reported Mind Springs's conduct.

164. Mind Springs's reports to the Colorado Medical Board and Colorado Board of Nursing, as well as Mr. Sheehan's statements in the *Grand Junction Sentinel*, interfered with Dr. James's and Ms. Arata's efforts to find new positions at other healthcare providers.

165. Upon information and belief, at the time Mr. Sheehan made these statements in the *Grand Junction Sentinel* about Dr. James and Ms. Arata, and at the time he decided to terminate them, he believed that they had reported their concerns regarding Mind Springs's practices to Rocky Mountain Health Plans and CDPHE.

## CLAIMS FOR RELIEF

### First Claim
### Retaliation in Violation of the False Claims Act (31 U.S.C. § 3730(h))
### Plaintiffs Frank James, M.D., and Chelsea Arata Against Mind Springs

166.  The allegations contained in this Complaint are incorporated herein as if fully stated.

***Dr. James & Retaliation in Violation of the False Claims Act***

167.  Dr. James engaged in protected activity under the False Claims Act when he, *inter alia*, engaged in efforts to stop what he reasonably believed were one or more violations of the False Claims Act.

168.  Dr. James engaged in protected activity under the False Claims Act when he, *inter alia*, engaged in lawful acts in furtherance of a claim under the False Claims Act.

169.  Dr. James reasonably believed that Mind Springs was engaged in conduct that had or would violate the False Claims Act.

170.  Dr. James's supervisor and Mind Springs's CEO, Defendant John M. Sheehan, was on notice of Dr. James's protected reports and acts.

171.  Defendant Mind Springs took adverse action against Dr. James by discharging, demoting, suspending, threatening, and in other manners discriminating against him.

172.  Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in efforts to stop one or more violations of the False Claims Act.

173.  Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in lawful acts in furtherance of a claim under the False Claims Act.

174.   Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Dr. James were pretextual.

175.   Defendant Mind Springs's adverse actions against Dr. James violated § 3730(h).

176.   As a direct and proximate cause of such violation, Dr. James has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

### *Ms. Arata & Retaliation in Violation of the False Claims Act*

177.   Ms. Arata engaged in protected activity under the False Claims Act when she, *inter alia*, engaged in efforts to stop what she reasonably believed were one or more violations of the False Claims Act.

178.   Ms. Arata engaged in protected activity under the False Claims Act when she, *inter alia*, engaged in lawful acts in furtherance of a claim under the False Claims Act.

179.   Ms. Arata reasonably believed that Mind Springs was engaged in conduct that had or would violate the False Claims Act.

180.    Mind Springs's CEO, Defendant John M. Sheehan, and Ms. Arata's supervisor, Dr. Conklin, were on notice of Ms. Arata's protected conduct

181.   Defendant Mind Springs took an adverse action against Ms. Arata by discharging, demoting, suspending, threatening, and in other manners discriminating against her.

182.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in efforts to stop one or more violations of the False Claims Act.

183.    Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in lawful acts in furtherance of a claim under the False Claims Act.

184.    Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Ms. Arata were pretextual.

185.    Defendant Mind Springs's adverse actions against Ms. Arata violated § 3730(h).

186.    As a direct and proximate cause of such violation, Ms. Arata has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

### Second Claim
**Retaliation in Violation of the Colorado False Claims Act (C.R.S. § 24-31-1204(8))**
**Plaintiffs Frank James, M.D., and Chelsea Arata Against Mind Springs**

187.    The allegations contained in this Complaint are incorporated herein as if fully stated.

### *Dr. James & Retaliation in Violation of the Colorado False Claims Act*

188.    Dr. James engaged in protected activity under the Colorado False Claims Act when he, *inter alia*, engaged in efforts to stop what he reasonably believed to be one or more violations of the Colorado False Claims Act.

189.    Dr. James engaged in protected activity under the Colorado False Claims Act when he, *inter alia*, engaged in lawful acts in furtherance of a claim under the Colorado False Claims Act.

190.    Dr. James reasonably believed that Mind Springs was engaged in conduct that had or would violate the Colorado False Claims Act.

191.   Dr. James's supervisor and Mind Springs's CEO, Defendant John M. Sheehan, was on notice of Dr. James's protected conduct.

192.   Defendant Mind Springs took an adverse action against Dr. James by discharging, demoting, suspending, threatening, and in other manners discriminating against him.

193.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in efforts to stop one or more violations of the Colorado False Claims Act.

194.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in lawful acts in furtherance of a claim under the Colorado False Claims Act.

195.   Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Dr. James were pretextual.

196.   Defendant Mind Springs's adverse actions against Dr. James violated § 24-31-1204(8).

197.   As a direct and proximate cause of such violation, Dr. James has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

### *Ms. Arata & Retaliation in Violation of the Colorado False Claims Act*

198.   Ms. Arata engaged in protected activity under the Colorado False Claims Act when she, *inter alia*, engaged in efforts to stop what she reasonably believed to be one or more violations of the Colorado False Claims Act.

199.   Ms. Arata engaged in protected activity under the Colorado False Claims Act when she, *inter alia*, engaged in lawful acts in furtherance of a claim under the Colorado False Claims Act.

200.   Ms. Arata reasonably believed that Mind Springs was engaged in conduct that violated the Colorado False Claims Act.

201.    Mind Springs's CEO, Defendant John M. Sheehan, and Ms. Arata's supervisor, Dr. Conklin, were on notice of Ms. Arata's protected conduct.

202.   Defendant Mind Springs took an adverse action against Ms. Arata by discharging, demoting, suspending, threatening, and in other manners discriminating against her.

203.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in efforts to stop one or more violations of the Colorado False Claims Act.

204.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in lawful acts in furtherance of a claim under the Colorado False Claims Act.

205.   Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Ms. Arata were pretextual.

206.   Defendant Mind Springs's adverse actions against Ms. Arata violated § 24-31-1204(8).

207.   As a direct and proximate cause of such violation, Ms. Arata has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

**Third Claim**
**Retaliation in Violation of the Colorado Medicaid False Claims Act**
**(C.R.S. § 25.5-4-306(7))**
**Plaintiffs Frank James, M.D., and Chelsea Arata Against Mind Springs**

208.   The allegations contained in this Complaint are incorporated herein as if fully stated.

***Dr. James & Retaliation in Violation of the Colorado Medicaid False Claims Act***

209.   Dr. James engaged in protected activity under the Colorado Medicaid False Claims Act when he, *inter alia*, engaged in efforts to stop what he reasonably believed to be one or more violations of the Colorado Medicaid False Claims Act.

210.   Dr. James engaged in protected activity under the Colorado Medicaid False Claims Act when he, *inter alia*, engaged in lawful acts in furtherance of a claim under the Colorado Medicaid False Claims Act.

211.   Dr. James reasonably believed that Mind Springs was engaged in conduct that violated the Colorado Medicaid False Claims Act.

212.   Dr. James's supervisor and Mind Springs's CEO, Defendant John M. Sheehan, was on notice of Dr. James's protected conduct.

213.   Defendant Mind Springs took an adverse action against Dr. James by discharging, demoting, suspending, threatening, and in other manners discriminating against him.

214.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in efforts to stop one or more violations of the Colorado Medicaid False Claims Act.

215.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Dr. James because he engaged in lawful acts in furtherance of a claim under the Colorado Medicaid False Claims Act.

216.    Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Dr. James were pretextual.

217.    Defendant Mind Springs's adverse actions against Dr. James violated § 25.5-4-306(7).

218.    As a direct and proximate cause of such violation, Dr. James has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

***Ms. Arata & Retaliation in Violation of the Colorado Medicaid False Claims Act***

219.    Ms. Arata engaged in protected activity under the Colorado Medicaid False Claims Act when she, *inter alia*, engaged in efforts to stop what she reasonably believe to be one or more violations of the Colorado Medicaid False Claims Act.

220.    Ms. Arata engaged in protected activity under the Colorado Medicaid False Claims Act when she, *inter alia*, engaged in lawful acts in furtherance of a claim under the Colorado Medicaid False Claims Act.

221.    Ms. Arata reasonably believed that Mind Springs was engaged in conduct that violated the Colorado Medicaid False Claims Act.

222.    Mind Springs's CEO, Defendant John M. Sheehan, and Ms. Arata's supervisor, Dr. Conklin, were on notice of Ms. Arata's protected conduct.

223.    Defendant Mind Springs took an adverse action against Ms. Arata by discharging, demoting, suspending, threatening, and in other manners discriminating against her.

224.    Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in efforts to stop one or more violations of the Colorado Medicaid False Claims Act.

225.   Defendant Mind Springs discharged, demoted, suspended, threatened, harassed, and in other manners discriminated against Ms. Arata because she engaged in lawful acts in furtherance of a claim under the Colorado Medicaid False Claims Act.

226.   Defendant Mind Springs's justifications for demoting, suspending, threatening, harassing, and in other manners discriminating against Ms. Arata were pretextual.

227.   Defendant Mind Springs's adverse actions against Ms. Arata violated § 25.5-4-306(7).

228.   As a direct and proximate cause of such violation, Ms. Arata has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

### Fourth Claim
### Wrongful Discharge in Violation of Public Policy
### Plaintiffs Frank James, M.D., and Chelsea Arata Against Mind Springs

229.   The allegations contained in this Complaint are incorporated herein as if fully stated.

***Mind Springs Wrongfully Terminated Dr. James for His Refusal to Engage in Conduct that Would Violate Public Policy and Because Dr. James Engaged in Conduct that is Protected or Encouraged as a Matter of Public Policy***

230.   Mind Springs employed Dr. James.

231.   Mind Springs terminated Dr. James on September 20, 2022.

232.   Mind Springs directed Dr. James to perform illegal acts that violated federal and state laws and regulations as part of his work-related duties, and prohibited him from performing a public duty or exercising a job-related right.

233.   Mind Springs directed Dr. James to perform an illegal act under Colorado law by, *inter alia*, directing Dr. James to admit children under the age of twelve into Mind Springs's adolescent inpatient and outpatient psychiatric programs and facilities.

234.   Mind Springs directed Dr. James to perform an illegal act under Colorado law by, *inter alia*, directing Dr. James to manipulate patient information and diagnoses.

235.   Dr. James's supervisor, Defendant John Sheehan, was on notice of Dr. James's concerns about Mind Springs's illegal activities, including, *inter alia*, Dr. James's concern that Mind Springs was creating clear dangers to patient safety.

236.   As a licensed medical physician exercising his independent professional judgment, Dr. James reasonably believed that Mind Springs's directives constituted acts or omissions that failed to meet generally accepted standards of medical practice, and instructions to administer treatment that were demonstrably unnecessary for many Mind Springs patients.

237.   Dr. James determined, under his independent professional judgment as a licensed physician under Colorado law, that it was improper, *inter alia*, for Mind Springs to admit children under the age of twelve into WSH and MSH.

238.   Mind Springs's directives to Dr. James prohibited him from exercising the job-related right or privilege of his independent professional judgment as a physician.

239.   Mind Springs prohibited and made efforts to block Dr. James from exercising the job-related right or privilege and performing the public duty of reporting internally and to outside regulators, including the CDPHE, his good faith reports and disclosures regarding, *inter alia*, his patient safety concerns.

240.    Dr. James raised external concerns to the CDPHE about patient safety at Mind Springs and Mind Springs's compliance with Colorado medical laws and regulations.

241.    Mind Springs's directives to Dr. James regarding patient admissions and the manipulation of patient diagnoses violated Colorado law by, *inter alia*, failing to develop and implement policies to ensure the safety of patients.

242.    Mind Springs terminated Dr. James for refusing to engage in Mr. Sheehan's directed and illegal conduct.

243.    Mind Springs terminated Dr. James for reporting his reasonable belief, based on his independent professional judgment, that Mind Springs violated numerous federal and state laws and regulations.

244.    Dr. James was terminated from his employment at Mind Springs for exercising the job-related right of his independent professional judgment as a physician.

245.    The state of Colorado has a clear and express public policy in protecting whistleblowers from retaliatory discharge, or engaging in any other conduct that exposes an employer's alleged wrongdoing.

246.    The state of Colorado has a clear and express public policy in protecting medical workers from retaliatory discharge.

247.    The state of Colorado has a clear and express public policy prohibiting employers from knowingly perpetuating a fraud or deception on the federal and/or state government.

248.    The state of Colorado has a clear and express public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's perpetuation in defrauding the federal and/or state government.

249. Dr. James's termination undermines the state of Colorado's clear and express public policies that, *inter alia*, protect whistleblowers from retaliatory discharge, or engaging in any other conduct that exposes an employer's alleged wrongdoing, and terminating an employee's good faith attempt to prevent the employer's perpetuation in defrauding the federal and/or state government.

250. Dr. James has suffered and will continue to suffer substantial economic and non-economic damages as a result of Mind Springs's termination of his in violation of public policy, in an amount to be proven at trial, including but not limited to lost income and benefits; compensatory damages, psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and loss of enjoyment of life.

***Mind Springs Wrongfully Terminated Ms. Arata for Her Refusal to Engage in Conduct that Would Violate Public Policy and Because Ms. Arata Engaged in Conduct that is Protected or Encouraged as a Matter of Public Policy***

251. Mind Springs employed Ms. Arata.

252. Mind Springs terminated Ms. Arata on September 26, 2022.

253. Mind Springs directed Ms. Arata to perform illegal acts as part of her work-related duties and prohibited her from performing a public duty or exercising a job-related right.

254. Mind Springs directed Ms. Arata to perform an illegal act under Colorado law by, *inter alia*, directing Ms. Arata to admit children under the age of twelve into Mind Springs's adolescent inpatient and outpatient psychiatric programs and facilities.

255. Mind Springs directed Ms. Arata to perform an illegal act under Colorado law by, *inter alia*, directing Ms. Arata to manipulate patient information and diagnoses.

256.    For Ms. Arata, a licensed nurse practitioner in the state of Colorado, Mind Springs' directives to, *inter alia*, admit children under the age of twelve were acts inconsistent with the health and safety of patients under her care.

257.    Ms. Arata's supervisors, including Dr. Conklin and Defendant John Sheehan, were on notice of Ms. Arata's concerns and complaints regarding Mind Springs's directions to perform illegal actions under Colorado law.

258.    Mind Springs prohibited and made efforts to block Ms. Arata from exercising the job-related right or privilege and performing the public duty of reporting internally and to outside regulators her good faith reports and disclosures regarding, *inter alia*, her patient safety concerns.

259.    Mind Springs's directives to Ms. Arata regarding, *inter alia*, patient admissions violated Colorado laws related to public health, safety, and welfare, and undermined a clearly expressed public policy relating to Ms. Arata's basic responsibilities as a citizen and worker.

260.    Mind Springs terminated Ms. Arata for refusing to engage in Mr. Sheehan's and Mind Springs's directed and illegal conduct.

261.    At the time of her termination, Mr. Sheehan believed Ms. Arata had filed an official complaint with the CDPHE regarding Mind Springs's conduct.

262.    Mind Springs was aware of Ms. Arata's reasonable belief that its conduct was unlawful.

263.    Ms. Arata was terminated from her employment at Mind Springs for exercising the job-related right as a licensed nurse practitioner to make good-faith reports regarding

Mind Springs's conduct that violated Colorado medical laws and regulations and created patient safety failures.

264. The state of Colorado has a clear and express public policy in protecting whistleblowers from retaliatory discharge, or engaging in any other conduct that exposes an employer's alleged wrongdoing.

265. The state of Colorado has a clear and express public policy prohibiting employers from knowingly perpetuating a fraud or deception on the federal and/or state government.

266. The state of Colorado has a clear and express public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's perpetuation in defrauding the federal and/or state government.

267. Ms. Arata's termination undermines the state of Colorado's clear and express public policies that, *inter alia*, protect whistleblowers from retaliatory discharge, or engaging in any other conduct that exposes an employer's alleged wrongdoing, and terminating an employee's good faith attempt to prevent the employer's perpetuation in defrauding the federal and/or state government.

268. Ms. Arata has suffered and will continue to suffer substantial economic and non-economic damages as a result of Mind Springs's termination of her in violation of public policy, in an amount to be proven at trial, including but not limited to lost income and benefits; compensatory damages, psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and loss of enjoyment of life.

## Fifth Claim
### Violations of the Colorado Health Care Whistleblower Protection Bill
### (C.R.S. § 8-2-123)
### Plaintiffs Frank James, M.D., and Chelsea Arata Against Mind Springs

269.   The allegations contained in this Complaint are incorporated herein as if fully stated.

***Dr. James & Retaliation in Violation of the Colorado Health Care Whistleblower Protection Bill***

270.   Dr. James engaged in protected activity under the Colorado Health Care Whistleblower Protection Bill when he, *inter alia*, made good faith reports and/or disclosures regarding patient safety information and/or quality of patient care without malice or consideration of personal benefit.

271.   When making his good faith reports and/or disclosures regarding patient safety information and/or quality of care, Dr. James had reasonable cause to believe his good faith reports and/or disclosures regarding patient safety information and/or quality of care were true.

272.   Dr. James reported that Mind Springs's practices, procedures, actions, and failures to act with regard to patient safety violated, *inter alia*, generally accepted standards of care, laws, rules, and regulations, including numerous Colorado medical laws and regulations to which Mind Springs and its subsidiaries were subject and required to comply.

273.   Dr. James's supervisor, Defendant Sheehan, was on notice of Dr. James's protected activity.

274.   Mind Springs and its subsidiaries are health-care facilities that are licensed health-care providers under Colorado law.

275.   Dr. James is health-care worker under Colorado law because he is a physician who is certified, registered, and/or licensed pursuant to Colorado law to practice medicine and the healing arts under Colorado law in the state of Colorado.

276.   Defendant Mind Springs directly and/or indirectly disciplined and/or penalized Dr. James by dismissing, demoting, transferring, reassigning, suspending, taking corrective action against, reprimanding, admonishing, giving an unsatisfactory or below-standard performance evaluation to, subjecting to a reduction in force, withholding of work, changing work hours, giving a negative reference about, creating or tolerating a hostile work environment, and/or the threat of any such discipline or penalty against Dr. James.

277.   Mind Springs is a health-care provider who took disciplinary action against Dr. James, a health-care worker under Colorado law, in retaliation for making good faith reports and/or disclosures regarding patient safety information and/or the quality of patient care at Mind Springs.

278.   Prior to reporting his concerns regarding patient safety information and/or the quality of patient care at Mind Springs, Dr. James followed internal reporting procedures of Mind Springs, to the extent such procedures existed.

279.   Defendant Mind Springs's adverse actions against Dr. James violated § 8-2-123.

280.   As a direct and proximate cause of such violation, Dr. James has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

***Ms. Arata & Retaliation in Violation of the Colorado Health Care Whistleblower Protection Bill***

281. Ms. Arata engaged in protected activity under the Colorado Health Care Whistleblower Protection Bill when she, *inter alia*, made good faith reports and/or disclosures regarding patient safety information and/or quality of patient care without malice or consideration of personal benefit.

282. When making her good faith reports and/or disclosures regarding patient safety information and/or quality of care, Ms. Arata had reasonable cause to believe her good faith reports and/or disclosures regarding patient safety information and/or quality of care were true.

283. Ms. Arata reported that Mind Springs's practices, procedures, actions, and failures to act with regard to patient safety violated, *inter alia*, generally accepted standards of care, laws, rules, and regulations, including numerous Colorado laws and medical regulations to which Mind Springs and its subsidiaries were subject and required to comply.

284. Ms. Arata's supervisors, including Dr. Conklin and Defendant Sheehan, were on notice of Ms. Arata's protected activity.

285. Mind Springs and its subsidiaries are health-care facilities that are licensed health-care providers under Colorado law.

286. Ms. Arata is health-care worker under Colorado law because she is a nurse practitioner who is certified, registered, and/or licensed pursuant to Colorado law to practice medicine and the healing arts under Colorado law in the state of Colorado.

287. Defendant Mind Springs directly and/or indirectly disciplined and/or penalized Ms. Arata by dismissing, demoting, transferring, reassigning, suspending, taking

corrective action against, reprimanding, admonishing, giving an unsatisfactory or below-standard performance evaluation to, subjecting to a reduction in force, withholding of work, changing work hours, giving a negative reference about, creating or tolerating a hostile work environment, and/or the threat of any such discipline or penalty against her.

288.    Mind Springs is a health-care provider who took a disciplinary action against Ms. Arata, a health-care worker under Colorado law, in retaliation for making good faith reports and/or disclosures regarding patient safety information and/or the quality of patient care at Mind Springs.

289.    Defendant Mind Springs's adverse actions against Ms. Arata violated § 8-2-123.

290.    As a direct and proximate cause of such violation, Ms. Arata has suffered, and will likely continue to suffer significant economic and emotional injuries, damages, special damages, and losses.

### Sixth Claim
### Limiting Or Exercising Control Over Independent Professional Judgment
### (C.R.S. § 25-3-103.7)
### Plaintiff Frank James, M.D., Against Mind Springs

291.    The allegations contained in this Complaint are incorporated herein as if fully stated.

292.    Dr. James is a physician duly licensed to practice medicine and the healing arts under Colorado law.

293.    Mind Springs employed Dr. James as a physician.

294.    Mind Springs is a health-care facility under Colorado law, as it is a hospital, behavioral health safety net provider, federally qualified health center, and/or rural health clinic under Colorado law.

295.   Mind Springs limited or exercised control over Dr. James's independent professional judgment concerning the practice of medicine or diagnosis or treatment at Mind Springs.

296.   Mind Springs knowingly and/or recklessly limited or controlled Dr. James's independent professional judgment, and/or attempted to knowingly or recklessly limit or control Dr. James's independent professional judgment, and therefore violated the standards of operation governing it as a health-care facility.

297.   As a direct and proximate cause of such violation, Dr. James has suffered, and will likely continue to suffer, significant economic and emotional injuries, damages, special damages, and losses.

### Seventh Claim
**Breach of Contract**
**Plaintiff Frank James, M.D., and Against Mind Springs**

298.   The allegations contained in this Complaint are incorporated herein as if fully stated.

299.   Dr. James and Mind Springs entered into an employment agreement when Dr. James was hired as Chief Medical Officer.

300.   Dr. James performed his job and duties as Chief Medical Officer pursuant to the employment agreement's terms.

301.   Mind Springs failed to perform under the employment agreement.

302.   Mind Springs terminated Dr. James's employment without the "Gross Misconduct" or 90 notice of termination required under the employment agreement.

303.   Defendant Mind Springs's breach of contract with Dr. James has caused Dr. James damages and injuries, including past and future economic losses.

**Eighth Claim**
**Promissory Estoppel**
**(Pleaded in the Alternative to Breach of Contract Claim)**
**Plaintiff Frank James, M.D., and Against Mind Springs**

304.   The allegations contained in this Complaint are incorporated herein as if fully stated.

305.   On or about August 5, 2022, Defendant Mind Springs and John Sheehan made promises to Dr. James that he would be employed as Chief Medical Officer at Mind Springs for a term of three years with protections for his continued employment.

306.   Defendant Mind Springs and John Sheehan demonstrated their willingness to be bound by these promises.

307.   Defendant Mind Springs and John Sheehan reasonably expected, or reasonably should have expected, that the promises they created would induce Dr. James to accept the role of Chief Medical Officer and forego other employment.

308.   Dr. James reasonably believed that Defendant Mind Springs and John Sheehan would honor their promises and allow Dr. James to work at Mind Springs as Chief Medical Officer beginning on or about August 5, 2022, for a term of three years.

309.   Defendant Mind Springs's and John Sheehan's promises did, in fact, induce Dr. James's action in choosing to accept an offer of employment as Chief Medical Officer of Mind Springs and rejecting employment at Humana Incorporated as its Behavioral Health Medical Lead.

310.   Justice requires enforcement of Defendant Mind Spring's and John Sheehan's promises to Dr. James.

311.   At the time Defendant Mind Springs and John Sheehan made these promises to Dr. James, it was objectively reasonably foreseeable to the parties that Dr. James

would suffer economic, non-economic, general, and special damages in the event that Mind Springs and Mr. Sheehan breached their promises.

312.   Dr. James has, in fact, suffered economic, non-economic, general, and special damages as a result of Defendant Mind Springs and Dr. Sheehan's breaching their promises to him and his reasonable reliance on such promises.

313.   Dr. James's damages were the probable, or likely, result of Defendant Mind Springs and Mr. Sheehan's breaking their promises to Dr. James.

314.   Defendant Mind Springs and Mr. Sheehan knew, or reasonably should have known, that Dr. James's damages would probably be incurred by Dr. James in the event Defendant Mind Springs and Mr. Sheehan broke their promises to Dr. James, as these damages were objectively reasonably foreseeable to the parties, and were a natural, probable, and proximate consequence of Defendant Mind Springs and John Sheehan breaching such promises.

315.   The promises made to Dr. James by Defendant Mind Springs and Mr. Sheehan regarding his employment were promises related to the way in which she earns a living and provides for her basic needs, and thus, the promises included a personal component beyond a commercial promise.

316.   Defendant Mind Springs's and Mr. Sheehan's failing to perform pursuant to their promises caused more than an average degree of mental distress resulting from an average pecuniary loss.

317.   Defendant Mind Springs and Mr. Sheehan had reason to foresee both the type and general magnitude of Dr. James's general and special damages.

## Ninth Claim
## Tortious Interference with Employment Contracts
## Plaintiffs Frank James, M.D., and Chelsea Arata Against Defendant Sheehan

318.    The allegations contained in this Complaint are incorporated herein as if fully stated.

### *Mr. Sheehan's Tortious Interference with Dr. James's Employment Contract*

319.    Dr. James and Mind Springs entered into a valid employment agreement when Dr. James was hired as Chief Medical Officer.

320.    Mr. Sheehan knew Mind Springs's employment agreement with Dr. James existed.

321.    Mr. Sheehan sought to interfere in the contractual relations between Mind Springs and Dr. James.

322.    Mr. Sheehan's intentional interference with Dr. James's employment agreement was improper and lacked a proper business basis.

323.    Mr. Sheehan intentionally induced Mind Springs not to perform its obligations under the employment agreement with Dr. James.

324.    Mr. Sheehan intentionally made false misrepresentations regarding Dr. James's employment in order to induce Mind Springs not to perform under the employment agreement with Dr. James.

325.    Mr. Sheehan was motivated by a desire to induce Mind Springs to breach its employment agreement with Dr. James for a non-business reason.

326.    Mr. Sheehan's wrongful interference with Mind Springs's employment agreement with Dr. James involved Mr. Sheehan persuading Mind Springs, based on misrepresentations, to breach its existing employment agreement with Dr. James.

327.   Mr. Sheehan knew that Mind Springs's termination of the employment agreement with Dr. James was substantially certain to occur as a result of Mr. Sheehan's conduct.

328.   Dr. James had an interest in continuing his employment as Chief Medical Officer at Mind Springs under the employment agreement.

329.   Mr. Sheehan lacked any business justification to induce Mind Springs to terminate its employment agreement with Dr. James.

330.   Mind Springs's employment agreement with Dr. James is not prejudicial to any public interest.

331.   Mr. Sheehan had an improper interest in ensuring that the employment agreement between Mind Springs and Dr. James was terminated.

332.   There is a social interest in protecting Dr. James's contractual interests in the Chief Medical Officer employment agreement from Mr. Sheehan's fraudulent and intentional interference.

333.   Mind Springs's decision to breach the employment agreement is an immediate consequence of Mr. Sheehan's intentional interference.

334.   Defendant Mr. Sheehan's tortious interference with Dr. James's employment contract has caused and continues to cause Dr. James damages and injuries, including past and future economic damages and non-economic damages, including loss of earnings and loss of earning capacity, and other losses.

***Mr. Sheehan's Tortious Interference with Ms. Arata's Employment Contract***

335.   Ms. Arata and Mind Springs entered into a valid at will employment agreement.

336.   Mr. Sheehan knew Mind Springs's employment agreement with Ms. Arata existed.

337.    Mr. Sheehan sought to interfere in the contractual relations between Mind Springs and Ms. Arata.

338.    Mr. Sheehan's intentional interference with Ms. Arata's employment agreement was improper.

339.    Mr. Sheehan intentionally induced Mind Springs not to perform its obligations under the employment agreement with Ms. Arata.

340.    Mr. Sheehan intentionally made fraudulent misrepresentations regarding Ms. Arata's employment in order to induce Mind Springs not to perform under the employment agreement with Ms. Arata.

341.    Mr. Sheehan was motivated by a desire to induce Mind Springs to breach its employment agreement with Ms. Arata for a non-business reason.

342.    Mr. Sheehan's wrongful interference with Mind Springs's employment agreement with Ms. Arata involved Mr. Sheehan persuading Mind Springs, based on fraudulent misrepresentations, to breach its existing employment agreement with Ms. Arata.

343.    Mr. Sheehan knew that Mind Springs's termination of the employment agreement with Ms. Arata was substantially certain to occur as a result of Mr. Sheehan's conduct.

344.    Ms. Arata had an interest in continuing her employment as nurse practitioner at Mind Springs under the employment agreement.

345.    Mr. Sheehan lacked any justification to induce Mind Springs to terminate its employment agreement with Ms. Arata.

346.    Mind Springs's employment agreement with Ms. Arata is not prejudicial to any public interest.

347. Mr. Sheehan had an improper interest in ensuring that the employment agreement between Mind Springs and Ms. Arata was terminated.

348. There is a social interest in protecting Ms. Arata's contractual interests in the nurse practitioner employment agreement from Mr. Sheehan's fraudulent and intentional interference.

349. Mind Springs's decision to breach the employment agreement is an immediate consequence of Mr. Sheehan's intentional interference.

350. Defendant Mr. Sheehan's tortious interference with Ms. Arata's employment contract has caused and continues to cause Ms. Arata damages and injuries, including past and future economic damages and non-economic damages, including loss of earnings and loss of earning capacity, and other losses

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment against Defendants for the following:

a. Appropriate and equitable relief including but not limited to declaratory and injunctive remedies;

b. Appropriate relief including general damages, in the amount required to compensate Plaintiffs for the losses that are the natural and probable consequences of Defendants' conduct;

c. Appropriate relief including special damages, that Defendants knew or should have known when Plaintiffs and Defendants entered into employment agreements would probably be incurred if Plaintiffs' employment agreements were terminated;

d.  Actual economic damages as established at trial;

e.  Compensatory damages, including but not limited to, those for past and future pecuniary, including the loss of benefits under Plaintiffs' employment agreements with Defendants, and non-pecuniary losses, including emotional distress, suffering, loss of reputation, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

f.  Consequential damages resulting from Defendants' intentional interference with Plaintiffs' employment contracts;

g.  Punitive, liquidated, and/or exemplary damages in such amounts as are allowed by applicable law;

h.  Pre-judgment and post-judgment interest at the highest lawful rate;

i.  Reinstatement with the same seniority status that Plaintiffs would have had but for the retaliation and discrimination, or, if reinstatement is not feasible, an award of front pay;

j.  Back pay, and two times the amount of back pay, plus interest;

k.  Compensation for any special damages sustained as a result of Defendants' conduct, including litigation costs and reasonable attorneys' fees;

l.  A gross up for tax consequences of any lump sum judgment;

m. All costs and expenses of this litigation, including attorneys' fees and costs of court, as permitted by contract or statute; and

n.  All other relief on behalf of Plaintiffs to which they may be entitled, and that the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury.

Respectfully submitted this 10th day of February, 2025:


**OGBORN MIHM LLP**


*s/Clayton E. Wire*
Clayton E. Wire, Bar No. 41717
Ogborn Mihm LLP
1700 Lincoln Street, Suite 2700
Denver, CO 80203
(303) 592-5900
Clayton.Wire@omtrial.com

*Attorney for Plaintiffs*